On tbe bearing on tbe merits,
Bailey, Special J.,
delivered tbe following opinion of tbe court (which is published in 2 Leg. Pep., 165-167).
Tbe cross-bill alleges tbat complainant and bis father bad been for some years joint owners of valuable mills and *570 other property, and partners in the business conducted there; and from causes not necessary to- be recited in this opinion, differences had arisen between them, and the father became so> greatly enraged against the son, and so> unrelenting in hostility to him that to gratify his malice he was ready to adopt any course of conduct, however detrimental to- his own interest, that would bring destruction upon the son.
It alleges that during the military occupation of the country, in the year 1864, General Payne, a federal officer, was in command of the district where the parties lived, and that the complainant’s father, with the assistance of his second wife’s relations, had acquired an influence over this officer, whose aid he invoked and secured, in order to take by military force from the complainant the possession and control of the mills and other property, and had excited against complainant the animosity of Gen. Payne, who is described in the pleadings and evidence to have been a man of fierce passions, cruel, vindictive, and bloodthirsty, regardless of law and justice.
Complainant alleges that he lived under constant apprehension of military arrest, the loss of life and property, and at last yielding to an earnest desire for peace and safety, agreed to buy, and did buy from his father the interest of the latter in the mills and other property and assets of the firm, in consideraton for which he executed the note in question.
He states that the negotiations on the part of his father were conducted by Win. P. Hickerson, now one of the circuit judges of the State of Tennessee, and when he signed the note he explained to Hickerson the motives that impelled him to make the contract, saying he would sign anything to save himself and property from ruin, and to-guard against the rights of an innocent purchaser of the note, if it should afterwards be sold; asked that by its *571 terms the note should be declared not negotiable, which was agreed to.
He further alleges, that by the contract, he assumed tor pay and satisfy all the liabilities of the firm, and has discovered that the liabilities were much-greater than -they were then estimated to be, and moreover, that many debtors to the firm have since then proven tp be insolvent, whereby he has lost many thousands of dollars.
He says that by the terms agreed upon, he was to repay to his father all sums of money advanced for the business, with interest thereon, all of which were estimated at that time to amount to $23,600, for which sum the note calls, and he has since then discovered that it greatly exceeds the amount for which the note should have been given.
By the bill, he prays that the note may be delivered up, to be canceled, because he was in duress, and prompted to enter into the contract under such circumstances of fraud, threatened violence and actual danger, as deprived him of all free action, and on the ground of mistake, he asked that the contract should be rescinded and the amount due ascertained, which he offered to pay.
The executor and legatees answered, denying the charge of fraud, intimidation and threatened interference of military authority, but conceding that the note was executed upon a contract for the sale of the mills and other property, and assets of the firm, asserting that the contract was fairly made, was fully understood, voluntarily and freely executed, upon a full consideration, and moreover, that after the. close of the war the complainant remained in possession of the property, paying each year, according to the terms of the note, the interest that accrued, and made no complaint, until after the death of his father, which occurred in 1871, more than seven years after the date of the contract.
It would be a useless task to attempt to review the great volume of testimony that lies before us, or to enter into a *572 'discussion of the particulars of the unhappy differences that arose between a father and son, who in their business as in their social relations, seem to have been united for many years by the strong ties of interest, confidence- and affection.
The questions to be determined are, whether the contract, the subject-matter of this litigation, was obtained by fraud, or whether the complainant by reason of surrounding circumstances, was not a. free -agent, and yielded assent to the contract because of apparent danger to his person or property, and if neither fraud was practiced nor a state of duress existed, was the contract made under a mistake of facts so material as will at this late day warrant a court of equity interposing to forbid its enforcement.
Now, whatever apprehension may have been felt, at one time, by the complainant of interference by General Payne, in the affairs between himself and his father, it is made clearly tó appear that before the contract was consummated these apprehensions were removed, and he stood on such terms with that officer as to be safe from all efforts on the part of his father and others to do him injury.
It is also manifest that the differences between the complainant and his father in regard to their business affairs arose many months before General Payne appeared in that region of country, and that complainant had been solicitous to bring about a dissolution of the partnership, and, if necessary, to buy his father’s interest in the property. After the complainant instituted proceedings in the count}7 court of Rutherford County to have his father declared a lunatic, and by force carried him from Manchester to Murfreesboro to prevent his contemplated marriage, the parties became greatly embittered against each other, and both seemed earnestly to desire to close out their business relations.
Under these circumstances they mutually sought the friendly offices of Judge ITickerson, a gentleman of great *573 worth and high position, who as mediator brought about the contract of dissolution and sale.
The contract does not appear to have been the result of force or fear, but was brought about by a conviction in the minds of both parties that the interest of each would be promoted thereby; it was fairly made, after full consideration, and was understood' in all its terms. The fact that for more than six years after the restoration of peace and the reorganization of the courts, and until after the death of his father, the complainant annually paid interest upon the debt, is convincing evidence that this act was voluntary, and that he regarded it as binding.
It is shown also that the complainant, a thoroughly trained business man, had charge of the books of the firm,, and referred to them in making estimates of the sums advanced by and due to his father. There is no room to-doubt that the estimates then made were correct. At all events, he does not show to our satisfaction that he made a mistake as to the sum due, and having rested so many years without complaint, until after the death of his father and the loss of the books, he will not be permitted to overhaul the settlement without some explanation of the delay and proof of the mistakes alleged, by the clearest and most satisfactory testimony. This he has not done. Story’s Eq. Jur. §§1540, 1545, 1551.
The losses which have been sustained by the insolvency of debtors to the firm, by the terms of his contract, he must bear.
The decree of the chancellor is affirmed.